UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------ X
:
NITIN PATEL and DEEPAK PATEL,                      :
:
                                    Plaintiffs,    :
:
                    -v-                            :
:
BIJAL JANI,                                        :
:
                                    Defendant.     :
:
------------------------------------------------------------ X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: June 30, 2016

12-cv-9376 (KBF)

OPINION & ORDER

KATHERINE B. FORREST, District Judge:

This case is what is colloquially known as a mess: confused claims, confused facts, and confused arguments. Plaintiff's core claims are for legal malpractice and fraud. But despite a bench trial during which the Court heard from the parties and other witnesses—many of whom lied repeatedly during their testimony (with truth interspersed here and there)—certain details as to what really happened, to whom, precisely when, and why remain hazy.

The basic story involves plaintiffs Nitin and Deepak Patel, brothers who lost substantial amounts of money in connection with the acquisition and operation of the Binghamton Regency Hotel (the "Hotel") in Binghamton, New York. (The venture is generally referred to herein as the "Venture" or "Transaction.") In this lawsuit—one of several relating to the failure of the Venture—plaintiffs assert claims against Bijal Jani ("Bijal"), an attorney who represented them or a related entity in connection with certain aspects of the Venture, for legal malpractice

(Counts One and Three), breach of fiduciary duty (Count Two), and fraud (Count Four).

Although plaintiffs' claims are asserted solely against Bijal Jani, the bulk of plaintiffs' proof at trial and their arguments were dedicated to demonstrating that plaintiffs believed they were defrauded by her relatives—namely, her father, Mahesh Jani ("Mahesh"), and her brother, Ronak Jani ("Ronak"). Much of that evidence—while providing some context for what happened—did not assist the plaintiffs in carrying their burden of proof on liability as to the actual defendant, Bijal Jani. At the conclusion of the case, there were a myriad of shortfalls in plaintiffs' proof, including failure to adequately support that the claims were timely brought, a failure to show a fraudulent statement or material omission by Bijal Jani (versus someone else), and, in all events, a failure to show that the defendant possessed the requisite intent to defraud plaintiffs. Finally, and itself independently dispositive, plaintiffs failed to show that their loss was proximately caused by any action (or inaction) of the defendant.

The evidence at trial left no doubt as to the fact that the Venture was a failure and that plaintiffs lost a significant sum of money. But the evidence also amply demonstrated that the causal reason for the failure was not fraud or malpractice by the defendant, but a rather more mundane inability to line up financing on terms required by the sale agreement.

Accordingly, for the reasons discussed below, judgment is entered for defendant on all counts.

I.    OVERVIEW OF THESE PROCEEDINGS

Plaintiffs filed the instant lawsuit on December 26, 2012, alleging three types

of claims against defendant Bijal Jani: attorney malpractice, breach of fiduciary

duty, and fraud.  Specifically, plaintiffs allege that Bijal Jani committed malpractice

and breached her fiduciary duty to them by failing to:

1.  Include a mortgage contingency or structural inspection contingency in
    the Contract of Sale;

2.  Prepare a Shareholder's Agreement for "NJDV," the company established
    to purchase the Hotel;

3.  Properly advise plaintiffs as to due diligence regarding the Hotel;

4.  Properly advise plaintiffs as to the legal ramifications of a deed in lieu of
    foreclosure;

5.  Properly advise plaintiffs as to the legal consequences of a joint and
    several guarantee for a loan entered into following the initial closing made
    by U.S. Property Management; and

6.  Adequately disclose to plaintiffs a conflict of interest between herself and
    her family members who were involved in the Transaction.

(Compl. ¶¶ 54-76.)  In addition, plaintiffs allege that Bijal Jani defrauded them in

various ways including by conspiring with her family to induce plaintiffs to

purchase the Hotel without including (1), (2), and (5) above, concealing information

as to her representation of a prior, unsuccessful investor in the Hotel, and

concealing that proceeds of the U.S. Property Management loan were intended to

compensate a broker to whom her family owed commissions.

Defendant vigorously contests these allegations.  She begins by pointing out

that claims except for fraud were untimely brought.  In support, she asserts that

her initial retention by plaintiff was limited, and that for more than three years prior to commencement of suit, plaintiffs had ceased to view her, or use her, as their attorney and had each had hired their own attorney.

Defendant also asserts that plaintiffs have failed to carry their burden on the merits.  For example, she contends that plaintiffs cannot establish the critical causal link between her alleged deficient legal representation and any damages;  in effect, she argues that other forces—be it plaintiffs' own short-sightedness and inefficacy, the City of Binghamton's approach to the deal, the economy, or other family members' conduct—led to any financial losses.  She also contends that she only represented a corporation formed to acquire the Hotel and had no duty to the plaintiffs individually.  Finally, she argues that the specific steps she took did not constitute malpractice.  Defendant also defends her representation by arguing that there was no conflict of interest arising from her family members' involvement in the Transaction, and that any conflict was expressly known and waived.  As to the fraud claims, defendant argues that the majority of these claims are duplicative of the malpractice claims, and that plaintiffs have not and cannot establish crucial elements—in particular, that a material misrepresentation or omission was made at all, or that plaintiffs have proven reliance.

The Court held a three-day bench trial from December 7-9, 2015.  The parties called four fact witnesses, including both plaintiffs, defendant, and Mahesh Jani. Defendant also submitted the written declarations of the live witnesses and of Kenneth Frank ("Frank"), corporation counsel for the City of Binghamton (the

4

"City"), the seller of the Binghamton Regency Hotel.  The Court received several dozen documents into evidence.

After testimony from fact witnesses concluded on December 9, 2015, the Court invited defendants to move for judgment on partial findings under Fed. R. Civ. P. 52(c).[1]  Defendant filed her motion on December 10, 2015, and plaintiffs opposed on December 11, 2015.  The Court indicated that it would grant the Rule 52(c) motion as to the breach of fiduciary duty and malpractice claims because plaintiffs had been fully heard as to at least two dispositive issues raised by defendants,[2] but gave the parties an opportunity to submit further evidence as to the fraud claim.  (ECF No. 114.)  Defendant then submitted two additional affidavits from Ronak and Mahesh Jani and three additional documentary exhibits in opposition to the fraud claim.  (DX 67, 68, 69.)  On January 22, 2016, the parties confirmed that no additional evidence was forthcoming and that further live proceedings were unnecessary.  (ECF No. 134.)  This Opinion & Order constitutes the Court's findings of fact and conclusions of law pursuant to Rule 52(a) and (c).

---

[1]      Under Rule 52(c), a court presiding over a bench trial may "enter judgment against the party on a claim or defense that, under the controlling law, can be maintained or defeated only with a favorable finding on that issue" if "a party has been fully heard on [that] issue."  In addition, the Court may "decline to render any judgment until the close of the evidence."  Fed. R. Civ. P. 52(c).  The parties had been fully heard on all issues as to which the Court indicated it was granting the Rule 52(c) motion.

[2]      At that point, plaintiffs had presented all of their factual evidence and only their expert testimony remained.  Since the trial evidence had already demonstrated that the malpractice and breach of fiduciary duty claims were untimely and that plaintiffs could not support the necessary causation element based on the facts offered at trial, expert testimony was not required.

II.     FINDINGS OF FACT[3]

At trial, the witnesses recounted various versions of the tortured history of how the parties came to participate in the Venture and how it came to fail. Portions of the witnesses' narratives converge: plaintiffs Nitin and Deepak Patel are brothers who, along with friends and associates of Nitin's, became interested in purchasing a hotel located in Binghamton, New York, in the second half of 2008. Defendant Bijal Jani and her father, Mahesh, and brother, Ronak, were involved in that Transaction. Defendant served as an attorney for plaintiffs in some capacity during the initial acquisition process—although the parties dispute the extent to which she was involved and the scope of her responsibilities. Defendant's brother, Ronak, served as the real estate broker for the Transaction, and her father, Mahesh, was initially a financial consultant on the Transaction but later became a co-investor with plaintiffs.

In late 2008, plaintiffs formed a corporation to purchase the Hotel. They made an agreement with the seller, the City of Binghamton, to have a two-part closing eight months apart. The first or initial closing was largely successful. However, in the ensuing months—which also coincided with the throes of the financial crisis—the plaintiffs (and Mahesh Jani, who had by this point joined them as an investor) failed to obtain the financing to complete the second closing and

---

[3]       The Court makes its findings of fact based on the preponderance of the evidence. <u>See Scientific Components Corp. v. Sirenza Microdevices, Inc.</u>, 399 F. App'x 637, 638 (2d Cir. 2010). The Court has also considered evidentiary objections lodged by the parties. With regard to any objections to evidence cited in this Opinion not individually addressed, the Court finds that they are without merit.

finalize the purchase of the Hotel.  This failure occurred after all of the investors had put substantial sums into the Transaction.

Nitin Patel led the charge for plaintiffs in this lawsuit—he was present every day for trial and appeared to be far more invested in the lawsuit than his brother, Deepak.  It was absolutely clear at trial that Nitin Patel believes he was defrauded—not by Bijal Jani, but rather by her father, Mahesh.  Mahesh Jani is not a defendant in this case.  Nitin Patel's principal assertion is that Mahesh assured him that he either had or would line up the financing for the second closing.  The financing was never lined up and the City of Binghamton repossessed the Hotel. This litigation ensued.

In this particular action before the Court, only defendant Bijal Jani's conduct—not that of her family members—is at issue.  Below, the Court describes further details of the above summary description.

A.   The Investment Opportunity

In 2008, Nitin Patel and a longtime friend and former business partner, Jitendra Patel (no relation), began seeking a new investment opportunity. (Stipulated Facts ¶ 1, 6; Tr. 23, 25.)  In the summer of 2008, Nitin Patel and Jitendra Patel met Mahesh Jani and Ronak Jani.  (Tr. 28-29.)  Ronak Jani informed them that the Hotel was for sale.  (Tr. 32-34.)  After learning of the opportunity, Nitin and Jitendra became interesting in buying and "flipping" it.  (Tr. 32-33, 35.) Bijal Jani was not present at the initial meeting (although she was in her office nearby).  (Tr. 29-32, 465-66.)

Ronak Jani is a real estate broker with Jani Realty and Investments ("Jani Realty").  Mahesh Jani is Ronak's father and president of Ronak Project Development, a company that provides "consulting" services, which includes arranging financing with banks.  (Tr. 453-56.)

The Janis had previously worked with another group of investors, including Nawab U. Din and his company, Pretty Enterprises, in an unsuccessful attempt to purchase the Hotel during the summer of 2007.  (Kenneth Frank Decl., Court Ex. 5, ¶ 7-10, 12; PX 50; Tr. 346, 350.)  The City of Binghamton ("City") chose not to accept Pretty Enterprise's bid and instead accepted a different entity's offer because it had more experience in hotel management;  however, that latter entity could not obtain financing and was ultimately unable to complete the transaction.  (Frank Decl. ¶¶ 12-13.)  Following the collapse of this 2007 deal, the City of Binghamton's corporation counsel, Kenneth Frank, alerted Bijal Jani that the Hotel remained available for purchase.  (Stipulated Facts ¶ 9; Frank Decl. ¶ 14.)

B.  The Decision to Invest

After meeting with Mahesh and Ronak and visiting the Hotel several times, Nitin Patel and Jitendra Patel decided to invest.[4]  (Tr. 39-42.)  Both had significant business experience.  Together, they owned a wine importing company called "Friday Monkey" and a Wawa convenience store in Connecticut.  (Tr. 23-26.)

---

[4]     There is some question—ultimately immaterial—as to whether plaintiffs knew of the Jani family's involvement with the prior investors at the time they commenced discussions about the Hotel.  Although Bijal Jani testified that she informed Nitin and Jitendra upon initially meeting them on October 6, 2008 of the prior failed transaction, she lacked credibility on this point.  (Tr. 431.) In all events, Nawab U. Din, the investor in that prior transaction, eventually also joined plaintiffs as an investor in the Hotel in March 2009.

Nitin Patel also owned two convenience stores in New Jersey, one since 1996 and another since 2001.  (Tr. 15-17.)  He and his wife had also formed a corporation, Janki Property, through which they held a number of properties including a mixed-use commercial property in New Jersey and a liquor distribution store in Delaware.  (Tr. 16-20.)  Nitin Patel also had some experience with obtaining property financing including relating to the purchase of a house in New Jersey and the purchase of the mixed-use commercial property.  (Tr. 259-60.)

In his prior business ventures, Nitin Patel had retained an attorney to advise him; he also testified that he was familiar with financing contingencies.  (Tr. 22-23, 38-39.)  At trial, Nitin Patel appeared intelligent and articulate, and demonstrated substantial familiarity with the financial and business aspects of the Transaction.  Although he had no prior experience with owning or operating a hotel, he had owned a variety of retail businesses and was familiar with setting up an LLC, conducting due diligence, and obtaining financing.

The Court credits Bijal Jani's testimony that at the time of the initial closing, various statements by plaintiffs demonstrated their understanding that they would need to line up significant financing to close the second step of the Transaction.  For instance, on various occasions, both Nitin Patel and Jitendra Patel informed defendant of various relationships they had that might be useful in connection with obtaining financing.  Bijal Jani also testified credibly that as early as an initial meeting on October 6, 2008, they both told her that they would pursue financing opportunities with institutions such as TD Bank, Kearny Federal Savings Bank,

and Lakeland Bank.  She also testified credibly that Vipul Patel, an early potential

co-investor, had indicated that he was working with Hattan Capital Partners

("Hattan") as a potential source of financing for the Hotel.  (Tr. 332-33, 434; <u>see also</u>

DX 14.)

Nitin Patel and Jitendra Patel agreed to work with Ronak and Mahesh Jani

toward the purchase of the Hotel.  On October 6, 2008, Nitin Patel and Jitendra

Patel also signed a retainer agreement ("Retainer Agreement") for legal services

with Bijal Jani.  (DX 5.)

Bijal Jani has been admitted to practice law in New York since 1999.[5]

(Stipulated Facts ¶ 3; Tr. 309.)  She specializes in, <u>inter alia</u>, immigration law,

commercial transactions, and both commercial and residential real estate law.  (Tr.

---

[5]    Bijal Jani's testimony at trial shifted from time to time.  The Court was greatly troubled by
many parts of her testimony and, frankly, believed that at times she was simply lying.  This causes
the Court significant concern and to evaluate the entirety of her testimony with great care.
Nevertheless, on the key issues dispositive of this matter, the Court was able to discern what it
believes to be more likely true than not.
    The Court highlights a few examples of Bijal Jani's lack of credibility.  For instance, within
the first minutes of taking the stand at trial, Bijal Jani changed an important answer – responding
first that a key sentence as to potential conflicts in this particular situation in the Engagement
Letter had been added following consultation with Jitendra and Nitin; but then changed her answer
and stating instead that the language was a part of a template.  The Court questioned the witness on
this difference.  Bijal Jani stated that her second answer was accurate and that she had been
confused.  (Tr. 313-19; DX 5.)
    Bijal Jani also testified that she had never represented her family members in connection
with any commercial real estate transactions prior to October 2008, but then testified minutes later
that she forgot to mention that she had represented them.  (Bijal Jani Aff., ¶¶ 9-12; PX 31, 32; Tr.
310-313, 398-404.)
    At trial, Bijal Jani was also asked a series of questions as to whether she understood what
the "Ronak Group of Companies" was.  She testified, incredibly in both demeanor and content, that
she did not and had never discussed it with her father or brother.  (Tr. 337.)  Upon further
examination, she admitted that she had been listed as a "Management Executive" and "General
Counsel" for the Ronak Group of Companies on the company's website.  (PX 38; Tr. 340.)  Although
Bijal Jani claimed that the material was posted without her knowledge, the Court does not credit her
testimony on that point.  (PX 38; Tr. 340.)

309.)  She shares office space (for which she does not pay rent) with Mahesh and Ronak Jani.  (Stipulated Facts ¶¶ 4-5.)  The evidence at trial demonstrated that the time they entered into the Retainer Agreement, Nitin Patel and Jitendra Patel both clearly understood that Mahesh was Bijal Jani's father and that Ronak was her brother, and that each had roles in the Transaction.

The Retainer Agreement stated that Bijal Jani was to "render legal representation and services for the purchase of the Binghamton Regency, in Binghamton, New York and to take such steps and actions as may be necessary on the Client's behalf in such action."[6]  (DX 5.)  The Court finds that at the time the Retainer Agreement was executed, Bijal Jani had been retained to act as Nitin Patel and Jitendra Patel's attorney to bring the Transaction to an initial closing (which occurred on February 5, 2009).  (Tr. 62, 67, 168, 326.)  The Court also finds that this personal representation was not intended to, and did not, extend to the second closing.

Under the Retainer Agreement, Nitin Patel and Jitendra Patel agreed to pay defendant $3,750 immediately and another $3,750 at the time of initial closing.  (DX 5.)  Nitin Patel paid the initial $3,750 by personal check.  (DX 12.)  The remaining

---

[6]    Although Bijal claims that even her initial retention was to represent the corporate entity purchaser NJDV, and that the retainer agreement was written without reference to that corporate entity because it had not yet been formed, (Tr. 368, 416-17, 436), this is belied by the fact that she never revised the retainer agreement when the NJDV entity was formed.  She also referred to "clients" in the plural form in communications with Kenneth Frank, the City of Binghamton's corporation counsel, which is more consistent with her initial representation of Nitin and Jitendra personally.  (See, e.g., DX 46; PX 51.)

$3,750 was eventually paid to Bijal Jani after the initial closing on February 5, 2009.  (DX 26.)

Bijal Jani also provided a Letter of Engagement on October 6, 2008.  That letter stated in part:

> I have also advised you that I do not offer financial, tax, or other third party professional advice and that you seek out individual counsel/third party professionals to represent your independent interests.  You acknowledge full disclosure of the various parties involved in this transaction, including Jani Realty & Investments, Inc., Ronak Project Development, Ltd., and waive all conflict of interest claims against me.

(DX 6, at 2.)  Nitin Patel acknowledged signing the Letter of Engagement.  (Nitin Patel Decl., Court Ex. 1, ¶ 18; Tr. 78.)

Prior to the initial closing, Nitin Patel and Jitendra Patel sought other investors.  (Tr. 35-36.)  Nitin knew an individual, Vipul Patel, who had owned hotels in the past and who had previously invested in land with Nitin's wife;  Nitin believed Vipul would bring expertise to the Transaction and sought his participation.  (Tr. 35-36, 41-42, 93-94.)  Vipul, who lived in Atlanta, Georgia, dispatched his cousins as his representatives to visit the Hotel; his cousins apparently had experience in the hotel business as well.  (Tr. 35.)  In addition, in September 2008, Nitin had advised his brother, Deepak, the second plaintiff in this matter, a practicing cardiologist living in Texas, that the Hotel was a good investment.  (Deepak Patel Decl., Court Ex. 2, ¶ 3; Tr. 268-272.)  It is not clear exactly when Deepak decided to invest.

Deepak Patel—whose prior business experience included being a member of his private cardiology practice—had never invested with Nitin before.  Prior to agreeing to invest, Deepak never communicated directly with Jitendra Patel or Bijal, Mahesh, or Ronak Jani.  (Deepak Patel Decl. ¶ 8; Tr. 93, 269, 271-72.)  Nitin Patel represented to his brother that the Hotel was undervalued—and that it could be flipped for double or triple the purchase price.  (Tr. 271.)  Deepak testified that Nitin was his "only source of information" regarding the Hotel before he decided to invest.  (Tr. 272, 276.)

Deepak Patel eventually came to the New York area to visit the Hotel in December 2008.  During this trip, Deepak visited the Hotel with Mahesh Jani; Bijal was not present.  During the visit, Deepak asked Mahesh a number of questions including how the Transaction would be structured and about the financing and renovations.  Deepak understood that the investors would pay $2.5 million to obtain initial possession of the Hotel, begin operations, and then obtain financing for the second closing.  As of the time of his investment, Deepak understood that the financing to complete the second closing had not yet been secured.  (Tr. 277-79, 384-85.)

Deepak also met with Bijal Jani during this trip.  (Tr. 274-275.)  He never signed a retainer agreement with her.  (Tr. 271, 275.)  On this trip, she told him that she represented the NJDV shareholders in the Transaction.  (Tr. 274-75.)  The Court finds that Bijal Jani never formed an attorney-client relationship with Deepak Patel in his individual capacity.

13

In October 2008 (and thus prior to the initial closing), Bijal Jani assisted the investors with setting up a corporate entity called NJDV for the purposes of purchasing and operating the Hotel.  (Stipulated Facts ¶ 16; DX 11; Tr. 62-63.)  The four letters of the "NJDV" name stood for Nitin, Jitendra, Deepak, and Vipul.  (Stipulated Facts ¶ 17; Tr. 92.)  Mahesh Jani was not yet an investor in the Transaction and had no role in the establishment of the NJDV entity.

C.    The Letter of Intent

On October 6, 2008, Nitin and Jitendra presented a letter of intent ("LOI") to the City of Binghamton to purchase the Hotel on behalf of Nitin's company, Janki Property.[7]  (Stipulated Facts ¶ 10; DX 4; Tr. 44.)  The LOI's terms set forth the purchase price as $6.5 million, with $100,000 due immediately as a deposit, $2.4 million due at time of the initial closing (at which time the purchaser would take possession of the premises), and the remaining $4 million would be due eight months later at an anticipated second closing.[8]  (Stipulated Facts ¶ 10; DX 4.)  If the $4 million was not timely paid, the LOI provided that the City of Binghamton would regain possession of the Hotel.  (DX 4.)  The LOI also provided that Jani Realty would receive a real estate commission of 10 percent of the purchase price at the time of closing.  (Stipulated Facts ¶ 13; DX 4.)

---

[7]    This had occurred before the NJDV entity was established.

[8]    The LOI was printed on Jani Realty letterhead and Ronak Jani was listed as the real estate broker, demonstrating plaintiffs' familiarity with Ronak Jani's role in the Transaction.  (Stipulated Facts ¶ 12; DX 4.)

Nitin Patel was a signatory on the LOI.  (Stipulated Facts ¶ 11.)  On the same date that he signed the LOI, he also issued a check to the City of Binghamton for the $100,000 as a "Deposit for Purchase of Binghamton Hotel."  (DX 7.)  Nitin Patel testified that in deciding to proceed with the LOI for the Transaction, he relied on Mahesh Jani's representations to him, not Bijal's.  (Nitin Patel Decl. ¶ 9.)

The Retainer Agreement, Engagement Letter, and LOI are all dated October 6, 2008.  (DX 4, 5, 6.)  Although the LOI refers to Bijal Jani as counsel to the purchaser, (DX 4), the Court finds such representation did not extend to advice on the LOI itself.  The Court credits Bijal Jani's testimony that the LOI had already been executed when Nitin Patel and Jitendra Patel initially provided it to her, and that they did not request that she provide any legal advice as to that document.  (Tr. 326.)  Nitin Patel conceded that he never had a specific discussion with Bijal Jani regarding the terms of the Transaction—including prior to executing the LOI.  (Nitin Patel Decl. ¶¶ 19-21.)

The Court finds that when he signed the LOI, Nitin Patel understood that he was entering into a binding agreement with closing conditions and terms imposed by the City of Binghamton and that included an as yet unfinanced $4 million payment within eight months.[9]  (Tr. 54.)

---

[9]     Among the nebulous claims in this matter is one regarding an expectation that initial sums put down on the Hotel would be repaid, the Court finds that no such assurances were given by anyone to plaintiffs, including by Bijal Jani.  Although Nitin Patel testified that he believed the $2.4 million payment would be refunded if the later payment was not made, there was no credible evidence at trial that Bijal Jani (or anyone else) ever made such a representation.  He acknowledged at trial that the LOI states that only the $100,000 deposit is refundable.  (Tr. 54-55.)

At trial, Nitin Patel asserted that for the entire time between the date he signed the LOI in October 2008 until August of 2009, he believed that Mahesh Jani had lined up financing; the Court finds that this assertion lacked credibility and was contradicted by other evidence in the record,[10] and, in all events, did not involve Bijal Jani. (Tr. 88, 194, 211, 226.) There was no credible evidence in the record that Mahesh Jani—let alone Bijal Jani—ever assured Nitin Patel that financing had in fact been fully secured.[11] Rather, any statements were made by Mahesh Jani and constituted inactionable puffery, a confident businessman saying that everything would work out. In fact, Deepak Patel testified credibly that he had been told by Nitin from the outset that financing was not, in fact, in place; documents received in evidence corroborate this.

Deepak testified that in the period leading up to the closing, Mahesh had simply reassured him that there were no issues with financing, and that it would not be a problem to arrange financing. (Tr. 279, 285.) Deepak also testified that he was never told that any particular lending institution had been "lined up." (Tr. 285.) Deepak further testified credibly that Mahesh never represented to him that financing had been "lined up, locked and loaded," but rather that he was working

---

[10]     The Court finds that Nitin's account of his understanding (and bases for such understanding) during this period also lacked credibility. He claimed that he did not know what Jani Realty was or that various members of the family had roles in the Transaction. (Tr. 45.) He claimed that he took Mahesh and Ronak's "word for it" that the Hotel was worth $11 to 12 million, (Tr. 114-15).

[11]     Nitin testified that the Mahesh had represented that a lender had approved financing for a prior potential purchaser and that such financing would be—at some future point—converted to a loan for plaintiffs. (Tr. 216.)

towards it.[12]  (Tr. 285.)  Deepak stated that although Bijal was present during the two to three conference calls where financing was discussed, she made no statements on the subject.  (Tr. 282-83.)

There was other substantial evidence that prior to the initial closing, the investors knew that financing for the second closing had not been obtained.  On October 13, 2008, Jitendra Patel and Mahesh Jani entered into an Application Fee & Agreement whereby Mahesh, on behalf of Ronak Project Development, would "provide assistance in attempting to obtain financing" for the Hotel purchase.[13] (Stipulated Facts ¶ 18; DX 10.)  The first paragraph of this October 13, 2008 agreement stated that Ronak Project Development would "provide assistance in attempting to obtain financing" for the Hotel.  (DX 10, at 1.)  The Agreement further provided, "You understand that we will seek the best possible rate and the terms, but that no guarantees, implicit or otherwise, are made."  (DX 10)  It also states, in bold and italic font on the second page, that "You are aware of the hazards of obtaining commercial financing and acknowledge that RPDL has made no

---

[12]     This contradicts Deepak Patel's declaration, in which he stated that "Mahesh explained that he had already arranged for the financing . . . that financing was in place."  (Deepak Patel Decl. ¶¶ 13-14.)  The Court credits Deepak Patel's in-court testimony.

[13]     The Agreement stated—and Nitin Patel testified at trial that he had been told the same— that if the Contract for Sale was not executed, then $30,000 would be refunded.  (DX 10, at 2.) Neither Nitin nor Deepak ever paid the $30,000 to RPDL; instead, Jitendra Patel paid it.  (Tr. 256.)

guarantee in the outcome of any phase of the loan transaction."[14]  (DX 10, at 2; Tr. 100-01.)

There was no evidence at trial that plaintiffs asked to see any confirmation that the financing had been committed.  (Tr. 113-14.)  There was no credible evidence at trial that had Bijal Jani taken different actions, plaintiffs would have not invested or timely withdrawn from the deal.  Nitin Patel acknowledged at trial that Bijal Jani never stated that financing was in place, nor had he ever had a conversation with her about financing.  (Tr. 56-57, 64, 213.)

D.   The Contract of Sale

On October 22, 2008, NJDV signed a Contract of Sale ("Contract") to purchase the Hotel.  (Stipulated Facts ¶ 19; DX 15.)  While Nitin believed that Bijal Jani prepared the Contract, the document was in fact prepared by the City's counsel, Kenneth Frank, with edits by Bijal Jani.  (DX 54; PX 20.)  The final Contract contained the following terms:

- Purchase Price: $6.5 million;

- Initial $100,000;

- 30 day due diligence contingency period to inspect and investigate the premises;

- A two-part closing, whereby

  o $2.4 million is due to the City of Binghamton upon initial closing;

---

[14]   While Nitin Patel testified that the atmosphere in the Janis' offices was loud and not conducive to quiet review of documentation, he nonetheless conceded that he had reviewed this document prior to the time that Jitendra signed it.  (Tr. 98-100.)

- o $4 million due to the City of Binghamton eight months from date of closing, secured by a non-interest bearing note;

- Deed in lieu of foreclosure held by Corporation Counsel for City of Binghamton prior to NJDV paying off balance of purchase price.

(Stipulated Facts ¶ 20.)

The Contract did not include a financing contingency.  When negotiating the Contract, Bijal Jani asked Kenneth Frank, the attorney for the City of Binghamton, "if the City would consider a financing contingency in the Contract."  Frank responded that, for several reasons, "this would not be acceptable."  (Frank Decl., ¶¶ 19-20; Tr. 396.)  Based on a comparison of the draft and final version of the Contract of Sale and communications between Frank and Bijal Jani, it also appears that she had also negotiated for a 30 day due diligence period instead of the original 15 days that Frank proposed.  (DX 54, at 3; DX 15, at 2; PX 20.)

Jitendra Patel signed the Contract of Sale for NJDV on October 22, 2008, but Nitin Patel had also reviewed the contents prior to the signing.  (DX 15; Tr. 121.) On December 18, 2008, the Contract was fully executed when it was countersigned by the Mayor of the City of Binghamton.  (Stipulated Facts ¶ 23; DX 15, 16.)  The 30 day period for reviewing the due diligence information commenced on that date. (Tr. 133.)

E.     Due Diligence

Prior to executing the Contract of Sale, the investors were given an opportunity to engage in due diligence.[15]  On December 13, 2008, Ronak Jani sent an email to Nitin, Jitendra, Vipul, Vipul's cousins, and Bijal.  The email was a response to their "due diligence request" and provided a series of financial projections and documents and other materials related to the Hotel.  (DX 14.)  The e-mail explicitly stated that the recipients should call Ronak Jani if they could not access any of the documents. (DX 14.)  Nitin Patel testified that he never reviewed any of the documents and that he relied on Vipul and Vipul's cousins to do so.  (Tr. 118-19.)

On December 19, 2008, the NJDV investors received a copy of an environmental report, which indicated the presence of contaminants in the soil near an underground petroleum storage tank on Hotel premises.  (DX 17.)  Inexplicably, the cover email accompanying the report indicated that "the report shows that the property is clean" and "free of all contaminants."  (DX 17.)  The email was sent by either Ronak or Mahesh Jani.  (DX 17; Tr. 134.)  Bijal Jani was not copied on the cover email.  (DX 17.)  However, it was uncontested at trial that she secured an unconditional indemnification agreement whereby the City of Binghamton agreed to hold NJDV harmless from all costs associated with the remediation of the environmental contamination problem.  (Bijal Jani Aff., Court Ex. 3, ¶ 53.)

---

[15]     The LOI had provided for the right of the purchasers to inspect the premises within 30 days of the date the LOI took effect—a date that was not in the record.  (DX 4.)  Thus, plaintiffs had thirty days from some point after October 22, 2008 to perform inspections, as well as an additional 30 days from December 18, 2008, the date on which the Contract of Sale was executed.  (DX 4, 15.)

Nitin Patel testified the Contract provided for various inspections of the structure and other elements of the premises.  (DX 15; Tr. 127-28.)  However, apparently no such inspection occurred.  (Tr. 130.)

F.     Mahesh Jani Becomes an Investor

At some point in November or December 2008 (prior to the initial closing), Vipul Patel decided not to invest in the Hotel.  (Stipulated Facts ¶ 25; Tr. 40-41.)[16] He had tried to negotiate a decrease in the purchase price for the Hotel from $6.5 million to $5.5 million; when that was unsuccessful, he backed out of the deal.  (Tr. 145-46.)  Vipul's exit gave Nitin some pause, but Mahesh Jani offered to join as an investor to replace Vipul.  (Tr. 146-48.)  Although the Court found Mahesh Jani generally to lack credibility when he testified, it does credit his testimony that he became an investor because—at the time—he believed the Hotel was "a good deal." (Tr. 467-68.)

Bijal Jani testified that in January 2009, she became aware that Mahesh wanted to become an investor in NJDV.  (Tr. 380.)  It is more likely than not that Mahesh's changed role raised Bijal's awareness of her conflicted position.  (See, e.g., Tr. 384.)  The Court credits her testimony that she informed the Patel investors that they should seek independent legal counsel for the initial closing.  (Tr. 367.) During the period between December 2008 and January 2009, Jitendra Patel did indeed retain a personal attorney, Donald Ohnegian.  (Tr. 371-72.)  Bijal Jani

---

[16]     Although the parties stipulated that Vipul Patel withdrew from the deal in November 2008, he and Hattan Capital were nevertheless copied on Ronak Jani's December 13, 2008 e-mail regarding due diligence.  (DX 14.)

testified that Ohnegian told her he represented both Jitendra and Nitin Patel.  (Tr. 372, 421-22.)

G.    <u>The Initial Closing</u>

The initial closing occurred on February 5, 2009.[17]  The night before the closing, Nitin, Jitendra, and the Jani Family spoke in the Jani Offices; Nitin and Jitendra were informed that there would be a $150,000 shortfall in the cash due at the initial closing.  The next day, Jitendra, Nitin, and Mahesh each signed a personal guaranty on the $150,000 shortfall, in the form of a promissory note due within 30 days.  (DX 25; Bijal Jani Aff. ¶ 65.)[18]  There was no credible evidence at trial that Bijal Jani was ever requested by plaintiffs to provide either of them with legal advice with regards to this guarantee.

On the day of the initial closing, Nitin, Deepak, Jitendra, and Mahesh entered into a Joint Venture Agreement and Memorandum of Understanding regarding NJDV ("MOU").  (DX 20.)  There is no dispute that Bijal Jani emailed this document in draft form to Nitin Patel and Jitendra Patel on January 19, 2009.  (DX 18.)  Nitin claims he is "not sure" why Bijal sent this to him, and he claims he never discussed it with her.  (Tr. 142.)

---

[17]    Prior to this time, Nitin Patel had attended four other closings in connection with his prior investments.  (Tr. 159.)

[18]    Bijal Jani also testified that she had "pleaded with all of them to rethink the idea of moving forward and appearing at the closing the next day with the City of Binghamton because I was not shown any kind of a financing commitment from any entity."  (Tr. 420.)  The investors acknowledged her concerns but believed eight months was sufficient to secure financing.  (Tr. 426.)

The MOU was signed by all four NJDV participants.  (DX 18, 20; Tr. 379.)  It provided that Nitin, Deepak, and Mahesh would each have 20% of the shares, ownership, and net proceeds, and that Jitendra would have 10%; the remaining 30 percent would be "allocated at a later stage upon unanimous agreement."  (DX 20.) It provided that Jitendra would be the President of NJDV and authorized to execute closing documents.  (DX 20.)  The MOU also provided the following amounts that each individual would contribute to the initial closing:

- $300,000 by Jitendra;

- $600,000 by Nitin;

- $600,00 by Deepak (split between a $500,000 initial payment and $100,000 paid within two weeks of the signing); and

- $600,000 by Mahesh.

(DX 20 ¶ 13.)  In addition, the MOU provided, "All undersigned individuals in their individual capacities and as shareholders of NJDV Hospitality, Inc., hereby agree to utilize good faith best efforts to secure financing from a third party lending institution in order to pay the City of Binghamton the $4,000,000 due as per the Contract of Sale dated December 19, 2008."  (DX 20 ¶14.)

As part of the initial closing, Jitendra Patel, as President and on behalf of NJDV, signed a Purchase Money Mortgage on behalf of NJDV.  (DX 22.)  In signing this Purchase Money Mortgage, NJDV obligated itself to pay $4,100,000 to the City of Binghamton by October 5, 2009.  (DX 22.)  Jitendra, on behalf of NJDV, also signed a UCC Security Agreement and Promissory Note at the same time.  (DX 23,

24.)  Bijal Jani sent each of the investor copies of the Closing Statement that listed the amounts due.  (DX 21, 27, 28, 29, 30.)

At the initial closing, Bijal Jani transferred the remaining balance of $3,750 due to her under the Retainer Agreement to herself from her escrow account.[19]  (DX 26.)

H.   NJDV Reorganization

Following the initial closing, NJDV immediately took possession of the Hotel. (Stipulated Facts ¶ 31.)  On March 5, 2009, Jitendra Patel, as President of NJDV, executed a new retainer agreement with Bijal Jani.  (Stipulated Facts ¶ 32; DX 31.) The new agreement states that Bijal Jani was retained to provide "general counsel services" for NJDV. (DX 31.)  Nitin Patel testified at trial that he did view the services that Bijal Jani was retained by NJDV to provide as different from those she had previously provided to him individually.  (Tr. 167-68.)  Specifically, he understood that she would deal with vendors and other operational activities for the Hotel.  (Tr. 168.)  The new retainer agreement provided that Bijal Jani would be paid $200 per hour, up to $20,000 per year, although she was never paid for the services she performed.  (Bijal Jani Aff. ¶ 72; DX 31; Tr. 167-69.)[20]

In March 2009, Mahesh introduced the other NJDV investors to Nawab U. Din, another potential investor.  (Tr. 163-64.)  Din had previously attempted to

---

[19]    This payment was also set forth on the Closing Statement.  (DX 21.)

[20]    The Court finds that Bijal Jani was not representing Nitin Patel in an individual capacity after the initial closing, that she never told him she was, and that he did not understand her to be. Although Nitin testified that Bijal's personal representation continued because of the shortfall in funding at closing, that assertion is unsupported by the record.

purchase the Hotel in the summer of 2007, but his offer had been rejected in favor of another buyer.  (Id.; Frank Decl. ¶ 12.)  Din became an investor in NJDV on March 17, 2009.  (DX 34.)  On that date, the members of NJDV executed an Addendum to the MOU, providing that Nitin owned 28% of the NJDV shares, Deepak owned 20%, Jitendra owned 17%, Mahesh owned 28%, and Din owned 7%. (DX 34; Tr. 180.)

On the same day, Nitin, Jitendra, and Mahesh entered into an Authority & Indemnification Agreement Resolution, whereby they agreed to indemnify each other in the event that loans obtained by NJDV that required its members to give personal guarantees went unpaid.  (DX 33.)

On April 2, 2009, the members of NJDV executed a second Addendum of Joint Venture Agreement Memorandum of Understanding ("April 2, 2009 Addendum of Joint Venture Agreement").  In that agreement, Jitendra and Mahesh switched roles in NJDV:  Mahesh became President and Jitendra became Secretary.  (DX 35.)  Although the position of President was offered to Nitin, he had turned it down.  (Tr. 185.)  Nitin was Vice President and Treasurer of NJDV throughout the entire period.  (DX 35; Tr. 185.)  However, he testified that he did not undertake any particular responsibilities at that time and did not know what his responsibilities were.  (Tr. 185-86.)  Jitendra held the checkbook until some point after closing, at which time he turned it over to Mahesh.  (Tr. 186.)  The NJDV checkbook was never held or controlled by Bijal Jani.  (Tr. 186-87.)

In June 2009, Deepak Patel learned that there had been a redistribution of shares among shareholders from which he had been excluded.  (Deepak Patel Decl.

¶ 22; Tr. 202-03, 288-92.)  He retained counsel, David Coggin, a Texas attorney, to arrange for a repurchase of his shares and to terminate his relationship with NJDV. (Deepak Patel Decl. ¶23; DX 40, 41; Tr. 205, 289-92.)  On June 14, 2009, Deepak Patel notified the other shareholders and Bijal that he wished to withdraw as shareholder.  (DX 40.)  Mahesh Jani and Nitin Patel spoke with Deepak on the telephone and informed him that they were willing to repurchase his shares.  (Tr. 201, 293.)

Coggin represented Deepak personally in connection with the repurchase and reviewed the documents involved, including a stock repurchase agreement and promissory note that provided that Deepak would be paid back $653,539 for his shares.  (DX 41, 43; Tr. 293-96.)  Deepak sold back his shares on July 22, 2009 via a share repurchase agreement and promissory note.  (DX 41, 43.)  He returned the physical share certificates within the week.  (Tr. 293-96.)  At this point, the relationship between Deepak and NJDV terminated.  (DX 41, 43; Tr. 293-94.)[21]

I.   Ed Revere Commission and the U.S. Property Management Loan

In approximately April 2009, the NJDV investors sought a loan from U.S. Property Management.  On April 15, 2009, Nitin, Jitendra, and Mahesh executed a Promissory Note with U.S. Property Management for $300,000.  (DX 36.)[22]  The parties dispute why the loan was sought, what the funds were used for, and if Bijal

---

[21]   Deepak has not been paid the amounts set forth in the agreements.  In 2011, he sued NJDV, Mahesh Jani and Jitendra Patel.  (Tr. 300.)  As a result of that suit, he obtained a judgment of $651,656.44.  (Stipulated Facts ¶ 51; DX 50, 51.)  Jitendra paid him $220,000, but Mahesh paid nothing.  (Stipulated Facts ¶¶ 52-53; DX 52, 53.)  Deepak had separately received a payment of $100,000 from his brother Nitin.  (Tr. 306.)

[22]   The relationship with U.S. Property Management was initiated by Mahesh Jani.  (Tr. 169.)

Jani provided legal advice to NJDV—or anyone else—in connection with the loan. The trial record is clear that she did not represent plaintiffs personally in connection with the loan.  There is a separate question as to whether Bijal Jani defrauded plaintiffs in connection with the loan by misrepresenting the reason for obtaining the loan.  Specifically, plaintiffs allege that Bijal Jani lied about the role that a man named Ed Revere played in the Transaction.  The details relating to this fraud claim were not adequately developed at trial and ultimately unsupported by credible evidence.

Based upon the testimony and documents, the Court is able to discern the following:  Ed Revere was a real estate broker who had previously worked on the 2007 deal with Prety Enterprises (the failed 2007 investor with whom the Jani family worked, the principal of which, Nawab U. Din, became an investor in NJDV in March 2009).  (Stipulated Facts ¶¶ 21-22.)  Revere was not listed on the Contract of Sale or any other documents related to the NJDV Transaction.  (DX 15, 54.) However, the participants in NJDV agreed Revere would be earning a part of the commission on this Transaction, and Bijal Jani knew this.[23]  (Stipulated Facts ¶¶ 21-22.)

Bijal Jani testified that she told plaintiffs Revere would be acting as one of the brokers on the Transaction—but she told them that Revere was the City of Binghamton's broker.  It is unclear why she made this last statement given the

_____

[23]      In certain respects, Ed Revere's initial connection with Nawab U. Din's initial failed investment tied him into Mr. Din's eventual investment in the Hotel via NJDV.  Thus, a participating commission of some sort was not irrational or out of keeping with business tradition.

independent justification of a brokerage role on behalf of Mr. Din, and it was certainly false.  She also told plaintiffs the reason Revere was not listed on the Contract of Sale because there was an ordinance that forbade the City from paying a commission to its own broker.  (Tr. 356-58.)  This was also false.  According to the City's attorney Kenneth Frank, whom the Court credits as a disinterested third party, there was no such ordinance, and Revere was never the City's broker.  (Frank Decl. ¶¶ 15, 21-22.)  In all events, these statements were not causally related to Nitin Patel's agreement to agree to, or become a guarantor for, the U.S. Property Management loan.

The evidence at trial supports an independent business reason for the loan: it was sorely needed for basic operational reasons.[24]  Thus, while plaintiffs allege that the loan was a covert effort to turn a Jani family personal liability to Ed Revere into an NJDV liability, this allegation was not supported by the evidence.  The evidence is clear both that plaintiffs knew that Revere was acting as a broker in the Hotel and had been demanding payment from the investors <u>before</u> they applied for the U.S. Property Management loan, and that plaintiffs and NJDV assumed this payment obligation.  This is supported by at least the following:

On March 5, 2009, Revere wrote an email to Bijal Jani seeking his real estate commission.  (DX 67.)  Bijal Jani forwarded Revere's original email demanding payment to ronakgroup@yahoo.com.  (DX 67.)  On March 6, 2009, Mahesh, through

---

[24]     The evidence at trial demonstrated that the investors sought the $300,000 U.S. Property Management loan to cover the cash shortfall at the initial closing, fund renovations for the Hotel, and finance the acquisition of a "flag" from a third party hotel franchisor.  (Tr. 166, 169, 199, 366-67.)

the ronakgroup@yahoo.com email address, forwarded the Revere email to

ronakgroup@yahoo.com (intended for Ronak's receipt) and also blind copied each of

Jitendra, Nitin, and Revere.  Mahesh wrote, "Below is what Ed wrote in regards to

the Real Estate Broker check. This is extremely serious, and more effort needs to be

made towards the $300,000 that needs to be brought into NJDV's Account. Please

work on this faster and try to obtain those funds *as soon as possible*! Please note,

'time is of the essence' on this."  (PX 22 (emphasis in original); DX 67; Tr. 489, 491-

92.)  This email preceded the loan and Nitin Patel's guarantee.  Notably, Bijal Jani

was not copied on the email.  (DX 67; Tr. 491.)  Nitin Patel and Jitendra Patel and

Mahesh Jani obtained the U.S. Property Management loan for $300,000 over a

month later.[25]

J.     Personal Guaranty

The $300,000 loan from U.S. Property Management included a personal

guarantee by Nitin, Jitendra, and Mahesh.  (DX 36.)[26]  Nitin Patel conceded at trial

that he never had any discussions with Bijal Jani regarding this loan.  (Tr. 171-72.)

Nevertheless, he asserts that (1) he did not understand that he was personally

liable for the entire sum of the loan, and (2) that Bijal Jani somehow bears

responsibility to him personally for this.  There is insufficient evidence to support

---

[25]     There was no evidence in the record as to whether and when any of the proceeds from the
U.S. Property management loan were ever in fact paid to Ed Revere.

[26]     Nitin, Jitendra, and Mahesh also mortgaged the Hotel to U.S. Property Management as
additional security for the loan.  (DX 37.)  Both documents were drafted by Bijal Jani.  (Tr. 367.)

defendant's breach of any duty as an attorney or fraud in connection with the guarantee.

Based on the overwhelming evidence at trial, the Court finds that Nitin Patel fully understood that he was providing a personal guarantee that carried personal liability. First, he of course signed the guarantee itself—its terms are crystal-clear.[27] (Tr. 190-92; DX 36.) Second, his understanding of the terms is confirmed by his testimony that he had concerns about the loan because he was loathe to take on more debt—thus demonstrating his awareness of the liability. (Tr. 170.) While he asserted that he believed he was only responsible for the loan up to the percentage of shares he held in NJDV, this was unsupported by the evidence and contradicted by the record.

K.   <u>Preparations for Second Closing</u>

During the period after the initial closing, all of the NJDV investors knew that obtaining financing for the second closing was crucial. On May 11, 2009, Ronak Jani sent an e-mail to the NJDV investors asking them to review an LOI from Nationwide regarding financing. (DX 38.) On June 4, 2009, the NJDV officers executed an Amended Fee Agreement with Ronak Project Development, whereby Ronak Project Development agreed to postpone the payment of fees to it until a time when NJDV had sufficient funds, and agreed to refund fees if the financing was not secured for the second closing.[28] (DX 39 at 2; Tr. 197-98.) These documents clearly

---

[27]   Nitin Patel signed the promissory note twice—once on behalf of NJDV and once on behalf of himself as guarantor. (DX 36.)

[28]   The first agreement was executed in October 2008. (DX 10.)

indicated the uncertainty of financing for the second closing as of summer 2009. (DX 38, 39.)

During this period, Nitin Patel was also concerned about the Hotel's expenditures. At the time of closing, Nitin knew that he and his co-investors would begin operating the Hotel immediately. However, shortly after the closing, Nitin and his co-investors began disagreeing on various expenditures and strategic choices. (Tr. 162, 208.) For example, the Jani family began spending money on a pool; Nitin believed that the money would be better spent on a revenue-generating aspect of the business (rather than a service), such as the banquet hall. Nitin Patel informed Mahesh and Ronak Jani that he was dissatisfied with how things were proceeding.

However, Nitin Patel never consulted Bijal Jani directly about the expenditures, and she never provided him with any personal advice in connection with them. (Tr. 208-09.) In late August or early September 2009, he contacted an attorney, Harold Cook, Esq., to discuss expenditures by the Jani family on the Hotel. (DX 44; Tr. 227-28.) Nitin Patel testified that he retained Cook because he began losing faith in Bijal Jani and he felt that she was "siding on her family's side, and she would not listen to anything we were saying at that point." (Tr. 108-09, 228-29.) Jitendra Patel also retained his own attorney.

On September 3, 2009, Jitendra Patel's attorney, Alan Spiniello, wrote a letter to Bijal Jani regarding the creation of a new shareholder's agreement for NJDV. Harold Cook was copied on the letter. (Stipulated Facts ¶ 40; DX 44; Tr.

230.)  In the letter, which began with the line "Re: NJDV Hospitality, Inc.,"
Spiniello noted, "In accordance with our telephone conversation of September 2,
2009 this firm represents Jitendra Patel regarding the above captioned matter. It is
our understanding that you represent Mahesh Jani and that Harold P. Cook III,
Esq., represents Nitin Patel." (DX 44.)  In response to that letter, on September 4,
2009, Bijal Jani wrote to Spiniello clarifying, "In reference to your letter dated
September 3, 2009, please be advised that I serve in the capacity of general counsel
to NJDV Hospitality, Inc." (Stipulated Facts ¶ 41; DX 45; Tr. 233.)

In late September 2009, Mahesh Jani met with representatives of the City of
Binghamton to discuss the $4.1 million payment due at the second closing. (DX 46,
at 2.)  Mahesh asked for an extension on the payment and offered to pay in advance
the City's interest payments to the Department of Housing and Urban Development
("HUD") in the interim. (Id.)  On September 25, 2009, City made a counteroffer for
payment of $2.05 million of the amount due on October 5, 2009, and for the
remaining half to be due in February 2010, plus the HUD payments in the interim,
plus a number of other terms. (Id.)  Frank, the City's attorney, told Bijal Jani, as
attorney for NJDV, that should the purchasers not accept this offer, the City would
proceed on the deed in lieu of foreclosure. (Id.)

In response, Bijal Jani asked for an extension until July 30, 2010 to make the
$4.1 million payment.  She explained that NJDV had been putting diligent efforts
towards capital improvements on the Hotel and that due to the economic crisis,
"over one hundred lenders that were contacted have rejected the Hotel project."

(DX 46, at 1.)  The City did not accept, and stated that it understood this to be a rejection of its September 25 counteroffer.  (Id.)

    L.    <u>Bankruptcy</u>

    As described above, NJDV was unable to secure financing for the remaining $4.1 million due to the City of Binghamton.  (Stipulated Facts ¶ 43.)  In addition, after taking possession of the Hotel, NJDV failed to realize profits from the operation of the Hotel.  (Stipulated Facts ¶ 42.)  On October 3, 2009, NJDV filed for Chapter 11 bankruptcy protection in the U.S. Bankruptcy Court for the Southern District of New York.  (Stipulated Facts ¶ 44.)

    On Bijal Jani's advice, NJDV retained an attorney, Harvey Barr, for the bankruptcy proceedings.  (Stipulated Facts ¶ 45; Tr. 236, 240, 262.)  In early December 2009, Nitin Patel and Jitendra Patel retained attorney Joseph Fiorenzo to represent them in the effort to negotiations for a new agreement as to the distribution of shares of NJDV and in the bankruptcy proceedings.  (DX 47; Tr. 242-46.)  Nitin reiterated that he did not "trust" Bijal to draft the new agreement at this point.  (Tr. 242-44.)  Fiorenzo then communicated with Bijal Jani regarding proposed revisions to the Shareholder Agreement.  (DX 47.)  He stated, "our firm has been retained by Nitin Patel and Jitendra Patel in connection with the review of a certain shareholders agreement that I understand was drafted by you."  (DX 47; Tr. 245-46.)  The agreement was for Mahesh to take over 81% of the NJDV shares; Din would keep 7%, and Nitin and/or Jitendra would keep about 4%.  (Tr. 241.)

In March 2011, U.S. Property commenced an action against Nitin Patel, Jitendra Patel, Mahesh Jani, and NJDV for amounts due on its loan. (PX 24; Stipulated Facts ¶ 47.) The lawsuit resulted in a joint and several judgment on June 14, 2013 against Nitin, Jitendra, Mahesh, and NJDV in the amount of $300,000. (PX 27.)

On April 7, 2010, the City of Binghamton seized the Hotel pursuant to the deed in lieu of foreclosure. (Stipulated Facts ¶ 46; Bijal Jani Aff. ¶ 88.)

III.   CONCLUSIONS OF LAW

A.   <u>Statute of Limitations</u>

A legal malpractice claim accrues when the alleged malpractice is committed, and it must be commenced within three years of such conduct.[29] N.Y. CPLR § 214(6); <u>Nobile v. Schwartz</u>, 56 F. App'x 525, 526 (2d Cir. 2003); <u>Shumsky v. Eisenstein</u>, 750 N.E.2d 67, 69 (N.Y. 2001). A three-year statute of limitations also applies to claims for breach of fiduciary duty for monetary damages. <u>Ciccone v. Hersh</u>, 320 F. App'x 48, 50 (2d Cir. 2009); <u>see also</u> N.Y. CPLR § 214(4). Plaintiffs filed this action on December 26, 2012. Thus, any claim for legal malpractice or breach of fiduciary duty that accrued prior to December 26, 2009 is time-barred.

While New York does recognize a continuous representation doctrine exception that tolls the statute of limitations on a claim for legal malpractice or breach of fiduciary duty, the doctrine's reach is circumscribed to only those scenarios "where the continuing representation pertains specifically to the matter in

---

[29]    In this case, the substantive law of New York applies. <u>Rubens v. Mason</u>, 527 F.3d 252, 254 (2d Cir. 2008).

which the attorney committed the alleged malpractice." <u>Shumsky</u>, 750 N.E.2d at 71.  The fact that the attorney continued to generally represent the client does not trigger the continuous representation doctrine.  <u>Id.</u>; <u>see also</u> <u>Bastys v. Rothschild</u>, 154 F. App'x 260, 262 (2d Cir. 2005).  Plaintiff must demonstrate "clear indicia of an ongoing, continuous, developing, and dependent relationship between the client and the attorney which often includes an attempt by the attorney to rectify an alleged act of malpractice." <u>Luk Lamellen U. Kupplungbau GmbH v. Lerner</u>, 560 N.Y.S.2d 787, 789 (App. Div. 1990).

The trial evidence makes clear that both the legal malpractice and breach of fiduciary duty claims are time-barred and that there was no continuing representation that extends to December 26, 2009 or beyond.  The evidence is overwhelming that Bijal Jani's representation concluded months earlier.

Because plaintiffs brought this action on behalf of themselves, their claims are limited to any retention of defendant as their personal attorney.  Any such retention ended at the initial closing on February 5, 2009.  After the initial closing, defendant began representing NJDV;  any claim regarding that representation would have to have been brought as a claim on behalf of NJDV.  There is no such claim.

The Court further finds that Bijal Jani never had any attorney-client relationship with Deepak Patel individually;  he never signed a retainer agreement with her and there was no evidence that she ever provided personally him with any legal advice.  Even if there was any personal representation as to Deepak Patel, at

the very latest, it would have ceased when Deepak Patel obtained new counsel.  See In re Estate of Merker, 795 N.Y.S.2d 215, 216 (App. Div. 2005); Piliero v. Adler & Stavros, 723 N.Y.S.2d 91, 92 (App. Div. 2001).  This occurred at the very latest for on June 2009, when Deepak Patel retained attorney David Coggin to terminate his relationship with NJDV.  Thus, there is no question that his claims for malpractice and breach of fiduciary duty filed in December 2012—three years and five months later—is barred by the statute of limitations.

As to Nitin Patel, his personal attorney-client relationship with defendant did not extend past the February 5, 2009 initial closing.  In all events, even under the most permissive view of the facts, any personal representation ended for Nitin Patel when he retained another attorney, Harold Cook, in September 2009.  (Tr. 228-29.)  By this time, Bijal Jani and Jitendra Patel's personal lawyer began corresponding and meeting with Cook.  (DX 44; Tr. 229.)  Nitin Patel further testified that by the time NJDV filed for bankruptcy on October 3, 2009, he had ceased to trust Bijal Jani entirely and therefore did not "rely" on her for advice.[30]  Luk Lamellen, 560 N.Y.S.2d at 789 (1990) ("One of the predicates for the application of the doctrine is continuing trust and confidence in the relationship between the parties.")

---

[30]    Nitin Patel also retained Joseph Fiorenzo, in December 2009.  (Tr. 242-44; DX 47.)  Although the Court finds that any relationship with Bijal Jani ended in September 2009, there is no colorable argument that it could have possibly extended beyond December 24, 2009.  Thus, since the Complaint in this action was filed on December 26, 2012—more than three years later—it was untimely under this version of facts as well.

B.    Causation

Even if plaintiffs' legal malpractice and breach of fiduciary duty claims were timely, they would nevertheless fail because plaintiffs have failed to carry their burden as to causation.  Under New York law, "[r]ecovery for professional malpractice against an attorney requires proof of three elements: (1) the negligence of the attorney; (2) that the negligence was the proximate cause of the loss sustained; and (3) proof of actual damages.  It requires the plaintiff to establish that counsel failed to exercise the ordinary reasonable skill and knowledge commonly possessed by a member of the legal profession and that 'but for' the attorney's negligence the plaintiff would have prevailed in the matter or would have avoided damages."  Ulico Casualty Co. v. Wilson, Elser, Moskowitz, Edelman & Dicker, 865 N.Y.S.2d 14, 22 (App. Div. 2008) (internal quotation marks and citations omitted, emphasis added); see also Rubens v. Mason, 387 F.3d 183, 189 (2d Cir. 2004).  To prevail on a claim for breach of fiduciary duty related to attorney liability, a plaintiff must similarly demonstrate that the breach was the but-for cause of any damages.  Weil, Gotshal & Manges, LLP v. Fashion Boutique of Short Hills, Inc., 780 N.Y.S.2d 593, 596 (App. Div. 2004) ("We have never differentiated between the standard of causation requested for a claim of legal malpractice and one for breach of fiduciary duty in the context of attorney liability. The claims are co-extensive.").  Plaintiffs have failed to prove that they would not have sustained losses but for Bijal Jani's actions or omissions or any conflict of interest.

37

As is clear from the above recitation of facts, most of plaintiffs' claims revolve around Mahesh Jani's conduct in promising to obtain financing and failing to do so—misconduct that was not alleged in the Complaint.  The only connection of this conduct to Bijal Jani that plaintiffs allege is that she sat silently while her father made those representations.  However, the weight of the credible evidence shows that (1) no actionable guarantees as to financing were made, but, in all events, (2) any silence by Bijal Jani did not cause the project to fail.

Plaintiffs also assert that Bijal Jani's alleged failure to include a mortgage contingency in the Contract of Sale was malpractice.  The undisputed evidence at trial, however, showed that plaintiffs knew there was no mortgage contingency and that they nevertheless entered into the Contract of Sale because of, inter alia, their belief or hope that financing would be obtained for the balloon payment at the October 2009 second closing.  (See, e.g., Tr. 88, 97.)  In addition, there is no evidence that any attorney would have been able to get the City of Binghamton to agree to a contingency;  it is clear that Bijal Jani had attempted to negotiate one, but was unsuccessful.

Plaintiffs also failed to adequately support their claim that any omission in the Shareholder's Agreement (or advice given or not given in relation to it) caused plaintiffs' losses.  The evidence at trial showed that the NJDV MOU and subsequent addenda, as well as the Authority and Indemnification Agreement Resolution set out rights, responsibilities, and liabilities for NJDV shareholders.

38

(DX 18, 20, 22, 23, 24.)  Plaintiffs have proven no losses stemming from any alleged failure to delineate responsibilities according to these corporate documents.[31]

Plaintiffs' nebulous assertions regarding Bijal Jani's failure to properly advise them on "due diligence" also lacks any causal connection to the losses.  There was insufficient evidence that a lack of due diligence caused any material loss.[32] (DX 14; Tr. 118-19.)

Nitin Patel asserts that Bijal Jani committed malpractice by failing to advise him of the consequences of a deed in lieu of foreclosure.  This is a frivolous claim. The evidence at trial demonstrated that the concept of the deed in lieu of foreclosure was in the LOI and the Contract of Sale—neither of which were prepared by Bijal Jani and both of which Nitin Patel reviewed.  There was no credible evidence at trial that additional advice on this arrangement would have caused plaintiffs to back out of the deal.  There was also credible evidence that Nitin understood that the Hotel Transaction involved a two-part closing, that failure to complete the second closing would result in the City's repossession of the Hotel.  Furthermore, there was no evidence at trial that any breach regarding the deed-in-lieu caused

---

[31]     The Court notes that any losses sustained by Deepak Patel were a result of individual members of NJDV's failure to repay him on his promissory note, and not any action or omission on the part of Bijal Jani.

[32]     Plaintiffs also claim that Bijal Jani failed to order a structural inspection.  However, the evidence at trial shows that Jitendra Patel actually did order such an inspection, but that such an inspection never occurred.  (Tr. 127-30.)  There was no evidence that Bijal Jani's actions or inactions caused this; nor was there evidence at trial that any structural issues arose that would have caused plaintiffs to back out of the deal prior to the first closing date of February 5, 2009 and to avoid subsequent losses.

Nitin Patel any harm that he would not have also suffered if there was instead a foreclosure action.

Nitin Patel also claims that Bijal Jani failed to advise him of the consequences of a joint and several guarantee for the U.S. Property Management loan, resulting in a judgment against him personally. (DX 36.) This is a frivolous claim. The evidence at trial demonstrated that Nitin understood that he was personally guaranteeing the loan.

Finally, plaintiffs allege that Bijal Jani breached a duty of loyalty to them by representing them despite her familial relationship with Mahesh and Ronak Jani. However, the evidence is overwhelming at trial that plaintiffs knew from the beginning the precise relationship between Bijal, Mahesh and Ronak Jani.

Plaintiffs argue that such a conflict cannot be waived—but even if so, plaintiffs must prove causation, which they have not done. Thus, although plaintiffs claim, for example, that Bijal's rent-free office is a salient fact that they did not know, there was absolutely no credible evidence at trial that had plaintiffs known this, they would not have retained her, or not proceeded with the Transaction. Thus, plaintiffs have failed to prove a causal nexus between any alleged malpractice or breach of duty and any damages suffered by them.

C.   <u>Duplicative Fraud Claims</u>

"Where . . . a fraud claim is asserted in connection with charges of professional malpractice, it is sustainable only to the extent that it is premised upon one or more affirmative, intentional misrepresentations—that is, something more

egregious than mere concealment or failure to disclose one's own malpractice."
MIG, Inc. v. Paul, Weiss, Rifkind, Wharton & Garrison, L.L.P., 701 F. Supp. 2d 518,
533 (S.D.N.Y. 2010) (quoting White of Lake George Inc. v. Bell, 674 N.Y.S.2d 162,
163 (App. Div. 1998)), aff'd, 410 F. App'x 408 (2d Cir. 2011).  Here, plaintiffs' fraud
claims as to the mortgage contingency, structural inspection, shareholder's
agreement, and personal liability on the U.S. Property Management Loan are
identical to that of their malpractice loans and therefore are not actionable.

      D.    Merits of Fraud Claims

Even if plaintiffs' fraud claims are sustainable independently of the
malpractice claims, they nonetheless fail on the merits.  "A cause of action alleging
fraud requires a plaintiff to establish a misrepresentation or omission of material
fact which the defendant knew was false, that the misrepresentation was made to
induce the plaintiff's reliance, the plaintiff's justifiable reliance on the
misrepresentation or material omission, and a resulting injury."  Hense v. Baxter,
914 N.Y.S.2d 200, 202 (App Div. 2010).  In such actions, "[d]amages are limited to
actual loss, not to provide compensation for a possible gain."  Id., 914 N.Y.S.2d at
203.

Plaintiffs have failed to establish that Bijal Jani made a misrepresentation or
omission of material fact that she knew to be false and which was causal of their
loss.  Although the Complaint alleges that Bijal conspired with Mahesh to induce
Nitin to purchase the Hotel without a mortgage contingency, a structural inspection
contingency, and a shareholder's agreement, plaintiffs have failed to tie actual

misrepresentations or omissions to these issues.  The fact that there was no mortgage contingency was true—it was also accurately stated in the documents that Nitin reviewed and signed, such as the LOI and the Contract of Sale, neither of which were written by Bijal Jani.  (DX 4, 15.)  A structural inspection contingency was included in both the LOI and the Contract of Sale, and Nitin Patel knew that he could withdraw from the deal within 30 days of the execution of the Contract of Sale if there was a structural problem (or for any reason).  (Id.)  That a structural inspection was not undertaken does not sound in a claim for fraud, as there was absolutely no evidence that Bijal Jani made any representations or misrepresentations as to the existence of any inspection.  Finally, the fact that there was no shareholder's agreement was obvious—none of the documents presented to the plaintiffs purported to be a Shareholder's Agreement; nor have plaintiffs proven that any of the NJDV documents drafted by Bijal Jani included any misrepresentations or omissions of material fact.

Plaintiffs also allege that Bijal Jani's failure to disclose that she previously represented Nawab U. Din constituted fraud.  However, there was no evidence in the record that Din's failure to successfully purchase the Hotel had anything to do with plaintiffs' loss.

Finally, Nitin Patel alleges that Bijal Jani defrauded him with respect to the U.S. Property Management loan.  (Tr. 171-72.)  However, Nitin Patel acknowledges that he never consulted with Bijal as to the loan.  In addition, he has failed to prove

any material omission, since the promissory note itself made clear that he was signing a personal guaranty. (DX 36.)

As to the specific claim that Bijal hid the reason for the loan—that is, Ed Revere's demand for his brokerage commission—the evidence at trial is unequivocal that Nitin was blind-copied on the email from Mahesh Jani that forwarded Revere's demands to be paid. (DX 67.) Moreover, Bijal Jani herself was <u>not</u> copied on the email from Mahesh indicating that they must secure a loan of $300,000.[33]

IV.   CONCLUSION

For the reasons set forth above, the Court finds that plaintiffs have failed to meet their burden of proof as to each of the claims. Accordingly, judgment is entered for the defendant. Each party shall bear its own costs. This Opinion & Order constitutes the judgment of the Court and terminates the action.

SO ORDERED.

Dated:      New York, New York
            June 30, 2016

_____
KATHERINE B. FORREST
United States District Judge

---

[33]      As to the argument that Bijal Jani misrepresented the reason why Ed Revere was not listed as a broker on the Contract of Sale, there was no evidence at trial that any lie Bijal Jani told induced any justifiable reliance on the fact, or was the proximate cause of any injury.